Walter L. NIXON, Jr., Appellant,

v.

UNITED STATES of America, et al.

No. 90–5246.

United States Court of Appeals,
District of Columbia Circuit.

Argued March 14, 1991.

Decided July 9, 1991.

Rehearing Denied Aug. 6, 1991.

David O. Stewart, with whom Peter M. Brody was on the brief, Washington, D.C., for appellant.

Douglas Letter, Atty., Dept. of Justice, with whom Stuart M. Gerson, Asst. Atty. Gen., and Jay B. Stephens, U.S. Atty., were on the brief, Washington, D.C., for appellees.

Morgan J. Frankel, Asst. Senate Legal Counsel, with whom Michael Davidson, Senate Legal Counsel, and Ken U. Benjamin, Jr., Deputy Senate Legal Counsel, were on the brief, Washington, D.C., for amicus curiae urging that the judgment of the District Court be affirmed.

Before EDWARDS, WILLIAMS and RANDOLPH, Circuit Judges.

Opinion for the Court filed by Circuit Judge STEPHEN F. WILLIAMS.

Concurring opinion filed by Circuit Judge RANDOLPH.

Opinion dissenting in part and concurring in the judgment filed by Circuit Judge HARRY T. EDWARDS.

STEPHEN F. WILLIAMS, Circuit Judge:

Walter L. Nixon, Jr., formerly the Chief Judge of the U.S. District Court for the Southern District of Mississippi, was impeached by the House of Representatives and convicted by the Senate for giving false testimony to a grand jury investigating allegations that he had been bribed. Nixon seeks judicial review of the Senate's procedures—in particular, its use of a committee to take testimony and gather other evidence.

The Constitutional Convention, however, gave the Senate "the *sole* Power to try all Impeachments", Art. I, § 3, cl. 6 (emphasis added). It not only rejected proposals to assign the power to the federal courts, but it did so for reasons that are almost impossible to square with any judicial role in the process. We find Nixon's claim nonjusticiable.

\* \* \*

After an investigation into reports that Nixon had asked a local district attorney to stop the prosecution of a man whose father had enriched Nixon through an investment scheme, a grand jury indicted Nixon on one count of receiving an illegal gratuity and three counts of perjury before the grand jury. At trial, Nixon was convicted on two counts of perjury and acquitted on the other two counts. He was sentenced to prison, and his conviction was affirmed on appeal. See *United States v. Nixon*, 816 F.2d 1022 (5th Cir.1987); see also *United States v. Nixon*, 881 F.2d 1305 (5th Cir. 1989) (affirming the denial of Nixon's motion for a new trial).

Even after this conviction, Walter Nixon refused to resign from his office as a United States district judge, and while serving time in prison he continued to draw his judicial salary. See H.R.Rep. No. 36, 101st Cong., 1st Sess. 13 (1989). The House of Representatives began impeachment proceedings, see *id.*, and on May 10, 1989, it voted to impeach Nixon on three articles charging him with giving false testimony to the grand jury and bringing disrepute on the federal judiciary. See 135 Cong.Rec. H1811 (daily ed. May 10, 1989).

When these articles of impeachment were presented to the Senate, it invoked its own Impeachment Rule XI, under which the presiding officer appoints a committee of twelve senators "to receive evidence and take testimony". S.Imp.R. XI, *reprinted in* Senate Manual, S.Doc. No. 1, 101st Cong., 1st Sess. 186 (1989); see S.Res. 128, 101st Cong., 1st Sess.; 135 Cong.Rec. S5199 (daily ed. May 11, 1989). The committee conducted four days of hearings, taking live testimony from ten witnesses, including Nixon himself. See S.Rep. No. 164, 101st Cong., 1st Sess. 4 (1989). It then transmitted to the full Senate a complete record of the evidence and a report, summarizing both the undisputed and disputed facts of the case without resolving contested issues or recommending any particular disposition of the charges. See *id.* at 3–4.

After considering final briefs, hearing arguments on the Senate floor from both the impeachment managers and the defense, including a personal appeal from Nixon himself, and posing questions to the parties, see 135 Cong.Rec. S14,493–517 (daily ed. Nov. 1, 1989), the Senate voted by more than the constitutionally prescribed two-thirds majority to convict Nixon on two of the three articles. 135 Cong.Rec. S14,635 (daily ed. Nov. 3, 1989); see Art. I, § 3, cl. 6. The presiding officer entered judgment removing him from his office as a United States district judge. 135 Cong.Rec. at S14,636.

Nixon then sued in district court, arguing that the Senate's failure to give him a full evidentiary hearing before the entire Senate violated its constitutional duty to "try" all impeachments. See Art. I, § 3, cl. 6. He sought a declaratory judgment that his conviction by the Senate was void and that his judicial salary and privileges should be reinstated from the date of his conviction. The district court held that his claim was nonjusticiable, see *Nixon v. United States*, 744 F.Supp. 9 (D.D.C.1990), and we agree.

\* \* \*

"The House ... shall have the sole Power of Impeachment", Art. I, § 2, cl. 5, and "The Senate shall have the sole Power to try all Impeachments", Art. I, § 3, cl. 6. Nowhere else does the Constitution explicitly confer on a body the "sole" power to do anything. The only court to fully consider the issue before this case gave "sole" its full weight. It read the word to express an "intention that no other tribunal should have any jurisdiction of the cases tried under the provisions with reference to impeachment." *Ritter v. United States*, 84 Ct.Cl. 293, 296 (1936). The court went on:

The dictionary definition of the word "sole" is "being or acting without another" and we think it was intended that the Senate should act without any other tribunal having anything to do with the case. This would be the ordinary signification of the words and this construction is supported by a consideration of the proceedings of the Constitutional Convention and the uniform opinion of the authorities which have considered this matter.

*Id.* Indeed, the unanimous rejection of judicial review to which the court refers seems not to have been breached until Raoul Berger 20 years ago used a rather casual reading of *Powell v. McCormack*, 395 U.S. 486, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969), to claim the availability of judicial review. See Raoul Berger, Impeachment: The Constitutional Problems (1973); Staff of Senate Comm. on Rules and Administration, 93d Cong., 2d Sess., Impeachment: Miscellaneous Documents 170–71 (1974) ("Committee Print") (memorandum on judicial review of impeachment proceedings by Stephen F. Goldstein).

The history of the Constitution's impeachment provisions bears out *Ritter*'s understanding. Both of the broad proposals that provided the foundation for the Convention delegates' debates, Randolph's "Virginia Plan" and Paterson's "New Jersey Plan", gave the power to "hear and determine" impeachments to the federal judiciary. See 1 The Records of the Federal Convention of 1787, at 21–22 (Max Farrand ed. 1966) (Virginia Plan); *id.* at 244 (New Jersey Plan); see also P. Hoffer & N. Hull, Impeachment in America, 1635–1805, at 97–100 (1984). Madison supported this assignment, specifically favoring the Supreme Court, see 2 Farrand at 551, while Hamilton proposed a special court composed of the chief judge from each state's supreme court, see 1 Farrand at 292–93. However, once the Convention decided that a college of electors, rather than the Senate, should name the President, thereby eliminating a potential conflict between the Senate's roles as both selector and remover of the President, it authorized the Senate to conduct impeachment trials and to render final judgments by two-thirds vote. Hoffer & Hull at 98–99; 2 Farrand at 500–01, 552–53.

In the surviving scraps of Convention debate on the issue, the focus was on presidential impeachment. While both Madison and Pinckney opposed use of the Senate, as tending to increase executive dependence

on the legislative branch, Gouverneur Morris responded that the Supreme Court was "too few in number and might be warped or corrupted", and Roger Sherman suggested that the Court was an improper forum to try the President "because the Judges would be appointed by him." 2 Farrand at 551. These themes of conflict of interest—so typical of the framers' concern over checks and balances—persisted into later discussions of applying the impeachment power to judges.

In The Federalist, Hamilton identified the impeachment power as *the* basis for constraining usurpation by judges. Thus, in Federalist No. 79 he wrote:

> The precautions for their responsibility are comprised in the article respecting impeachments. They are liable to be impeached for mal-conduct by the house of representatives, and tried by the senate, and if convicted, may be dismissed from office and disqualified for holding any other. This is the only provision on the point, which is consistent with the necessary independence of the judicial character, and is the only one which we find in our own constitution in respect to our own judges.

The Federalist 532–33 (Jacob E. Cooke ed. 1961). A little later, though generally disparaging the risk of judicial aggrandizement as a mere "phantom", he went on again to identify impeachment as "the important constitutional check" and to justify the assignment to the Senate as a key assurance of the remedy's adequacy:

> And the inference [that usurpations were improbable] is greatly fortified by the consideration of the important constitutional check, which the power of instituting impeachments, in one part of the legislative body, and of determining upon them in the other, would give to that body upon the members of the judicial department. This is alone a complete security. There never can be danger that the judges, by a series of deliberate usurpations on the authority of the legislature, would hazard the united resentment of the body entrusted with it, while this body was possessed of the means of punishing their presumption by degrad-

ing them from their stations. While this ought to remove all apprehensions on the subject, it affords at the same time a cogent argument for constituting the senate a court for the trial of impeachments.

Federalist No. 81, Cooke ed. at 545–46. Hamilton's emphatic language would have fallen rather flat if candor had compelled him to add that, of course, the judges themselves would sit in final judgment over this check on their excesses.

The framers invoked an additional kind of conflict or bias to support use of the Senate rather than the judiciary for impeachment trials—the bias caused by a person's having played a role in a prior phase of an extended process. Article I specifies that a person convicted in impeachment proceedings "shall nevertheless be liable and subject to Indictment, Trial, Judgment and Punishment, according to Law." Art. I, § 3, cl. 7. Thus the Constitution explicitly anticipates two sets of proceedings for at least some officials who commit impeachable offenses—one in Congress and one in the courts. The Framers separated the two, trying to secure for the accused the benefit of independent judgments. Though Hamilton assumed (in line with other delegates' comments) that impeachment trials would precede criminal trials, his insistence on the need for distinct, independent forums is no less compelling when the sequence is reversed, as was true of Nixon:

> Would it be proper that the persons, who had disposed of his fame and his most valuable rights as a citizen in one trial, should in another trial, for the same offence, be also the disposers of his life and his fortune? Would there not be the greatest reason to apprehend, that error in the first sentence would be the parent of error in the second sentence? That the strong bias of one decision would be apt to overrule the influence of any new lights, which might be brought to vary the complexion of another decision?

Federalist No. 65, Cooke ed. at 442.

The risks from overlapping powers reach their apogee in a presidential impeachment

trial, for which the Chief Justice presides over the Senate. Art. I, § 3, cl. 6. Whether the Chief Justice has clashed with the Senate over trial procedures, as did Chief Justice Chase during the trial of President Andrew Johnson, see Berger at 268–69; Committee Print at 6–8, or concurred all the way, he would be seen as prejudiced in review of the impeachment trial. That no one recognized this conflict in the framing and ratification debates argues the implausibility of such review.

That the Convention intended the impeachment power to be qualified only by political forces is also reflected in constitutional language limiting the executive's authority. Just as Hamilton viewed impeachment as "the important constitutional check" on the judiciary (Federalist No. 81), he called the power "an essential check in the hands of [the legislative body] upon the encroachments of the executive". Federalist No. 66, Cooke ed. at 446; see also Federalist No. 65, Cooke ed. at 441 (describing impeachments as "a bridle in the hands of the legislative body upon the executive servants of the government"). The delegates made sure that the executive would have no power to undermine the check when they expressly excepted impeachments from the President's pardon power. Art. II, § 2, cl. 1. While the absence of any such express limitation on judicial interference might support an "expressio unius" argument in favor of judicial review, a more plausible reading is that the framers simply assumed that courts had nothing whatever to do with impeachments.

If the Constitution's text, backed by the historical evidence, prevents both the judiciary and the executive from constraining the legislative power of impeachment, did the framers just slip up, leaving an unchecked check? The answer can be found in Article I itself, which provides two safeguards *within* the legislative branch to control unwarranted use of impeachments: (1) the separation of impeachment powers between the House and the Senate, see Art. I, § 2, cl. 5; § 3, cl. 6, and (2) the requirement of a two-thirds vote in the Senate to convict, see Art. I, § 3, cl. 6.

Hamilton's response to fears of abuse, including concerns about mixing judicial and legislative power in one body, tracked the two limits found in Article I. First he argued that the division of the impeachment powers "guards against the danger of persecution from the prevalency of a factious spirit in either of [the two houses]." Federalist No. 66, Cooke ed. at 446. Then he concluded, "As the concurrence of two-thirds of the senate will be requisite to a condemnation, the security to innocence, from this additional circumstance, will be as complete as itself can desire." *Id.*

For Hamilton, that was enough. He made no reference to judicial review as a check of the power, in sharp contrast with his discussion of ordinary legislative powers. Compare Federalist No. 78, Cooke ed. at 524–25 (judicial review as a check on unconstitutional bills of attainder, ex post facto laws, and statutes). In fact, the parties have not identified a single statement in either the framers' or ratifiers' debates alluding even to the possibility of judicial review, and Berger, its ardent proponent, acknowledges the absence of any such mention at the state conventions. See Berger at 116. To check the impeachment power, the framers quite naturally relied on the political accountability of members of Congress. Thus judges, who on so many issues have the last word, must rely on the public as the ultimate check on impeachment, itself the Constitution's explicit check on their own excesses.

The broad scope of the Senate's power is further supported by the grant to each house of the power to "determine the Rules of its Proceedings". Art. I, § 5, cl. 2. This clause gives the Senate independent discretion to set procedural rules for impeachment trials, including the rule challenged by Nixon—Senate Impeachment Rule XI. The Supreme Court hinted, in a case where it refused to second-guess the House's rule on establishing the presence of a quorum, that congressional rules of procedure may be judicially reviewable in some circumstances if they "ignore constitutional restraints", see *United States v. Ballin*, 144 U.S. 1, 5, 12 S.Ct. 507, 509, 36 L.Ed. 321

(1892), but this court has refused (on prudential grounds) to review the House of Representative's rules allocating seats on committees, despite a claim that those rules violated the Fifth Amendment rights of members of the minority party in the House. *Vander Jagt v. O'Neill,* 699 F.2d 1166, 1173 (D.C.Cir.1983). The rules clause provides at least indirect support for the view that the Senate's "sole Power to try all Impeachments" includes the sole power to frame the rules it will follow in conducting such trials.

Constitutional exclusion of judicial review of impeachments would seem to be the end of the matter. But courts have long analyzed the justiciability of issues constitutionally committed to the other branches as part of the "political question" doctrine. See *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 164, 2 L.Ed. 60 (1803). If the Constitution makes a "textually demonstrable commitment" of *any* issue to "a coordinate political department", see *Baker v. Carr,* 369 U.S. 186, 217, 82 S.Ct. 691, 710, 7 L.Ed.2d 663 (1962), it so commits the conduct of impeachment trials to the Senate. It remains to consider whether *Powell v. McCormack,* 395 U.S. 486, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969), and later cases, have so shrunk the political question doctrine as to permit courts to set the boundaries of permissible impeachment trial procedure despite such a textual commitment. A careful reading of *Powell,* which explicitly preserved the political question doctrine, see *id.* at 518, 89 S.Ct. at 1962 ("It is well established that the federal courts will not adjudicate political questions"), suggests the contrary.

*Powell* concerned the interplay between three constitutional clauses: "Each House shall be the Judge of the Elections, Returns and Qualifications of its own Members" (Art. I, § 5, cl. 1); the qualifications for Representatives specified in Art. I, § 2, cl. 2; and the expulsion clause (Art. I, § 5, cl. 2). The Court embarked on its constitutional analysis of justiciability with the point that "[i]n order to determine whether there has been a textual commitment to a co-ordinate department of the Government, we must interpret the Constitution." 395

U.S. at 519, 89 S.Ct. at 1963. The Court then examined the text and history of Art. I, § 5 to determine whether the framers limited the scope of the textual commitment found in that clause by other constitutional provisions. It found such limits in Art. I, § 2's narrow list of qualifications (age, period of citizenship of the United States, and residence when elected). See *id.* at 520–21, 89 S.Ct. at 1963–64. The Court found its reading of the qualifications and exclusion clauses confirmed by the expulsion clause's requirement of a two-thirds vote, which would be wholly undercut by giving an unrestricted meaning to the exclusion clause. *Id.* at 547–48, 89 S.Ct. at 1977–78.

The Court's political question analysis in *Powell* thus relies heavily on the ultimate conclusion that it was the framers' intention "to deny either branch of Congress the authority to add to or otherwise vary the membership qualifications *expressly set forth in the Constitution.*" *Id.* at 532, 89 S.Ct. at 1969–70 (emphasis added); see also *id.* at 540, 89 S.Ct. at 1973–74 ("The debates at the state conventions also demonstrate the Framers' understanding that the qualifications for members of Congress had been fixed *in the Constitution.*") (emphasis added). The Court emphasized as a key piece of evidence this quotation from Federalist No. 60: "The qualifications of the persons who may choose or be chosen, as has been remarked upon another occasion, are defined and fixed in the constitution; and are *unalterable by the legislature.*" Cooke ed. at 409 (emphasis added), *quoted in Powell,* 395 U.S. at 539, 89 S.Ct. at 1973. The Federalist yields no parallel suggestion that the minimum procedures for conducting an impeachment trial are unalterable by the legislature and thus not textually committed. Thus application of *Powell*'s method—an analysis of the relevant constitutional text and history—leads here to a conclusion of nonjusticiability.

Later cases confirm this understanding of *Powell.* In *Roudebush v. Hartke,* 405 U.S. 15, 92 S.Ct. 804, 31 L.Ed.2d 1 (1972), the Supreme Court decided that a state's recount of ballots in a senatorial election

did not infringe on the Senate's power to "be the Judge of the Elections ... of its own members", Art. I, § 5, cl. 1, as the recount could "usurp" the Senate's function "only if it frustrate[d] the Senate's ability to make an independent final judgment", 405 U.S. at 25, 92 S.Ct. at 810–11, which it could not do, *id.* at 25–26, 92 S.Ct. at 810–11. While the wording of the holding itself carries an implication of nonjusticiability, the Court was more explicit in its rejection of a claim that the candidate's action had been mooted by the Senate's decision to seat one of the candidates, subject to the outcome of the case before the Court. It stated that it was "without power to alter the Senate's judgment", *id.* at 18–19, 92 S.Ct. at 807–08,[1] and that "[w]hich candidate is entitled to be seated in the Senate is, to be sure, a nonjusticiable political question", *id.* at 19, 92 S.Ct. at 807–08 (citing *Powell*). The Court decided that the case was not moot because the Senate had seated the other candidate only temporarily until the conclusion of the suit, after which it would "be free to make an *unconditional and final* judgment under Art. 1, § 5." *Id.* (emphasis added). This strong language indicates that the Court would find nonjusticiable any challenge to the Senate's "final" judgment in a disputed election, even a procedural challenge that alleged, for example, that the senators refused to hear critical witnesses on the validity of disputed ballots.

Since *Powell* and *Roudebush*, this court has refused to entertain objections not only to the substance but also to the *procedures* used by the House of Representatives in the exercise of its ballot-counting authority under Art. I, § 5, cl. 1 (each house "shall be the Judge of the Elections, Returns and Qualifications of its own Members"). In *Morgan v. United States*, 801 F.2d 445 (D.C.Cir.1986), a unanimous panel examined the text and history of the clause, noting especially that although it was attacked in the ratification debates, none of

its defenders "mention[ed] the safeguard of judicial review. Such a safeguard was evidently unthinkable, since the determination of the legislative House was *itself* deemed to be a *judicial* one." 801 F.2d at 447 (emphasis in original). The point applies with equal force here. We concluded that "[t]he exclusion of others—and in particular of others who are judges—could not be more evident." *Id.;* see also *McIntyre v. Fallahay,* 766 F.2d 1078, 1081 (7th Cir. 1985) ("The House is not only 'Judge' but also final arbiter. Its decisions about which ballots count, and who won, are not reviewable in any court....").

In *Morgan* we quite literally underscored that the elections clause makes each House "*the* Judge" of elections. 801 F.2d at 447 (emphasis in original opinion). If language making each house "the judge" of elections gives that house exclusive discretion to determine the procedures for making that judgment, it seems *a fortiori* that a clause granting the Senate "*the sole Power* to try all Impeachments" gives it sole discretion to choose its procedures. If the clause made the Senate "the sole trier of impeachments" the structure would be more parallel but the grant of exclusive authority no clearer.

Although the primary reason for invoking the political question doctrine in our case is the textual commitment of impeachment trials to the Senate, the need for finality also demands it. See *Baker v. Carr,* 369 U.S. at 210, 82 S.Ct. at 706. In the elections clause context, the *Morgan* court emphasized the need for "quick, decisive resolution of election controversies." *Morgan,* 801 F.2d at 450. The need for finality in impeachments is even more acute. If claims such as Nixon's were justiciable, procedural appeals from every impeachment trial would become routine, as the Court of Claims observed even in the less litigious era of the *Ritter* decision. See 84 Ct.Cl. at 299. For the impeach-

---

1. The Court appended the following footnote:
   6. See *Reed v. County Comm'rs,* 277 U.S. 376, 388, 48 S.Ct. 531, 532, 72 L.Ed. 924 (1928): "[The Senate] is the judge of the elections, returns and qualifications of its members. Art. I, § 5. It is fully empowered and may determine such matters without the aid of the House of Representatives or the Executive or Judicial Department."
   *Id.* at 19 n. 6, 92 S.Ct. at 807 n. 6.

ments that are anything but routine, those of presidents and chief justices, the intrusion of the courts would expose the political life of the country to months, or perhaps years, of chaos. Even if the courts qualified a finding of justiciability with a rule against stays or specific relief of any kind, their review would undermine the new President's or Chief Justice's legitimacy for at least as long as the process took. And a declaratory action *without* final relief awarding the office to one person or the other could confound matters indefinitely.

If the political question doctrine has no force where the Constitution has explicitly committed a power to a coordinate branch and where the need for finality is extreme, then it is surely dead. But although the Supreme Court has rarely applied the doctrine in recent years, see Dissent at 258 & n. 11, it has also declined the several opportunities available to dispatch it. See *Gilligan v. Morgan*, 413 U.S. 1, 93 S.Ct. 2440, 37 L.Ed.2d 407 (1973); *Roudebush v. Hartke*, 405 U.S. 15, 19, 92 S.Ct. 804, 807–08, 31 L.Ed.2d 1 (1972); *Powell*, 395 U.S. at 518, 89 S.Ct. at 1962. We honor the doctrine and apply it here.

\* \* \*

It does not help establish justiciability to pose hypotheticals of outrageous behavior by a coordinate branch, such as that the Senate might turn its impeachment trial responsibilities over "to a randomly chosen group of schoolchildren", Dissent at 259, or even pass a rule "allowing conviction and removal of impeached officers by a majority vote", *id.* at 256. If the Senate should ever be ready to abdicate its responsibilities to schoolchildren, or, moved by Caligula's appointment of his horse as senator, to an elephant from the National Zoo, the republic will have sunk to depths from which no court could rescue it. And if the senators try to ignore the clear require-

ment of a two-thirds vote for conviction, they will have to contend with public outrage that will ultimately impose its sanction at the ballot box.[2] Absent judicial review, the Senate takes sole responsibility for its impeachment procedures as a full-fledged constitutional actor, just as the framers intended.

It would be peculiarly ironic for the judiciary to take charge of defining the limits of permissible procedure out of concern over the Senate's possible excesses. The exercise of *any* final power is by definition open to monstrous hypothetical abuse. But judges exercise such power daily, unreviewably imposing procedural and substantive boundaries on almost every decision of the political branches. In all this we are free of political constraints, subject to correction solely by constitutional amendment and to sanction solely by impeachment. If the impeachment claims of a fellow judge were justiciable, the circle would be closed—the judiciary would have final, unreviewable power over the one procedure established to restrain excesses in all its other final and unreviewable powers: checkmate.

Today we refuse to embark on setting limits for the procedures the Senate may choose for the trial of impeachments; the Constitution excludes us. Walter Nixon's claim is not justiciable.[3]

*Affirmed.*

RANDOLPH, Circuit Judge, concurring:

We are in agreement that, "political question" or not, we must interpret the clause giving the Senate the "sole Power to try all Impeachments," U.S. CONST., art. I, § 3, cl. 6. My review of that clause leads me to conclude that the Senate, and the Senate alone, is to choose the method by

2. Because the two-thirds vote requirement of Art. I, § 3, cl. 6 is so concrete, the argument that it serves as an unalterable limit on the textual commitment of impeachments, with judicial review available for at least some claims of Senate disregard, is far more plausible under *Powell* than Nixon's effort to find justiciable limits in the word "try". However, we need not decide

this issue, so we leave it for the unlikely day of its arising.

3. Because Nixon's claim is nonjusticiable, we need not address appellees' argument that Nixon should have sued in Claims Court rather than district court.

which it exercises its "sole Power." The controlling question, it seems to me, is not whether the Senate acted in conformity with the historical understanding of the word "try," or even whether the word has a sufficiently concrete meaning to constitute a limitation on the Senate's power. It is whether the judiciary is to make those judgments.

The "sole Power to try all Impeachments" must include the sole power to set the procedures for trial, as the Senate did here. The Constitution names no other body to perform that function. Apart from the requirements that the Senators take an oath, that the Chief Justice preside over impeachments of Presidents, and that two thirds of the Senators present must concur, the Constitution is silent about other procedural details. If the Senate did not have the sole power to determine how to conduct the proceedings, if the judiciary had the final say on what procedures the Senate must put in place, it is only a short step to judicial review of the Senate's compliance with those procedures. Once that dike bursts, there can be no holding back the flood of issues that inevitably will be presented to the courts. One impeached official will claim as fundamental to a "trial" the right to an unbiased tribunal, free of undue political influence. Another will argue that notice was inadequate or that his right to call witnesses was impaired. Others will contend that their impeachments must be set aside because they were denied an adequate opportunity to cross-examine witnesses, or because improper evidence was introduced against them, or because some Senator made a prejudicial remark during the proceedings. "Procedural" challenges of this sort fill the pages of the federal reports. There is no reason to doubt that impeached individuals would be less vigorous litigators or that, over time, judicial review would lead to judicial control. Yet as Judge Williams ably demonstrates, the Framers did not intend the judiciary to perform such a reviewing function in impeachment trials. The Constitutional Convention removed impeachment from the Supreme Court's original jurisdiction and transferred the power to try impeachments to the Senate. 2 THE RECORDS OF THE FEDERAL CONVENTION OF 1787, at 186, 473, 493, 552–53, 592, 600–01 (M. Farrand ed. 1966). Both the Virginia and the New Jersey plans proposed entrusting judges with the power of impeachment, but the Framers considered it wiser to assign this function to the Senate. *See* 1 Farrand at 21–22, 244; 2 Farrand at 500–01 & 552–53; P. HOFFER & N. HULL, IMPEACHMENT IN AMERICA, 1635–1805, at 97–100 (1984). Although Madison favored giving the Supreme Court the power of impeachment, the Convention delegates rejected the idea. *See* 2 Farrand at 551. Whatever the precise rationale for this, concerns about the allocation of power were undoubtedly at work. Alexander Hamilton noted that the possibility of judicial usurpation of legislative power "affords ... a cogent argument for constituting the Senate a court for the trial of impeachments." THE FEDERALIST No. 81, at 546 (A. Hamilton) (J. Cooke ed.).

I hesitate to frame my conclusion that the Senate alone is to decide how to conduct impeachment trials in terms of the "political question" doctrine. I might have no difficulty doing so if the phrase simply meant that "the Constitution has committed the determination of the issue to another agency of government than the courts" (Wechsler, *Toward Neutral Principles of Constitutional Law*, 73 HARV.L.REV. 1, 9 (1959)). *Powell v. McCormack*, 395 U.S. 486, 518, 89 S.Ct. 1944, 1962, 23 L.Ed.2d 491 (1969), and *Baker v. Carr*, 369 U.S. 186, 217, 82 S.Ct. 691, 710, 7 L.Ed.2d 663 (1962), do begin by asking whether there has been a "textually demonstrable constitutional commitment of the issue to a coordinate branch of government." But in *Powell*, 395 U.S. at 521, 89 S.Ct. at 1963–64, the Court proceeded to answer a quite different question—"whether the 'qualifications' which Article I, Section 5 authorized the House to 'judge' were only those specified in Article I, Section 2 (and perhaps elsewhere in the Constitution)." Sandalow, *Comments on Powell v. McCormack*, 17 UCLA L. REV. 164, 172–73 (1969). Judge Edwards follows an analogous route. He believes that because the Sen-

ate's power is to "try" impeachments, the judiciary must first give content to the word "try" and then decide whether the Senate has exceeded that power. His approach ultimately leads to conferring on the courts a rather large role in impeachments although the Framers intentionally excluded the judiciary. As I have stated, I view the controlling question as whether the judiciary can pass upon the validity of the Senate's procedural decisions. My conclusion that the courts have no such role to play in the impeachment process ultimately rests on my interpretation of the Constitution. Perhaps the case qualifies as one presenting a "political question" within *Powell*'s meaning, perhaps not. It surely differs from *Powell* in one respect. In *Powell*, at least, another provision of the Constitution defined "Qualifications"; the same cannot be said for the word "try." At all events, I see no need to rely on the somewhat "amorphous" doctrine of "political question[s]." *Morgan v. United States*, 801 F.2d 445, 447 (D.C.Cir.1986) (Scalia, J.), *cert. denied*, 480 U.S. 911, 107 S.Ct. 1359, 94 L.Ed.2d 529 (1987).

HARRY T. EDWARDS, Circuit Judge, dissenting in part and concurring in the judgment:

In this case, Walter L. Nixon, Jr., a former United States District Judge, challenges the constitutionality of his conviction by the United States Senate on two articles of impeachment and his subsequent removal from the bench. Nixon contends that the Senate violated its express constitutional duty to "try" his impeachment by delegating most of the actual trial work to a special committee of 12 senators. The District Court found that Nixon had presented a significant constitutional question but that it was nonjusticiable under the political question doctrine. *See Nixon v. United States*, 744 F.Supp. 9, 13 (D.D.C. 1990).

I find that Nixon's claim is justiciable. Because Nixon alleges that the Senate violated an express textual limitation on its constitutional authority—that is, convicted him on articles of impeachment without first "try[ing]" him within the constitution-

al meaning of that term—the courts are not only competent, but duty-bound, to interpret the text and decide the constitutional question. *See Powell v. McCormack*, 395 U.S. 486, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969). Reaching the merits, however, I conclude that the Senate's use of a special committee to hear witnesses and gather evidence did not deprive Nixon of any constitutionally protected right. I would therefore affirm the judgment of the District Court, albeit on different grounds than those enunciated by the trial court or by the majority today.

### I. BACKGROUND

In early 1984, the Federal Bureau of Investigation ("FBI"), acting on tips, commenced an investigation of Walter L. Nixon, Jr., who was then Chief Judge of the U.S. District Court for the Southern District of Mississippi. The FBI was given reason to believe that, in consideration of certain financial inducements, Nixon had communicated with a local prosecutor on behalf of a friend's son who was facing possible drug charges. Following the FBI investigation, the case was presented to a grand jury, before whom Nixon testified. In his testimony to the grand jury, Nixon falsely denied ever having spoken with the local prosecutor about the drug prosecution. The grand jury then returned an indictment charging Nixon with one count of bribery and three counts of perjury. In 1986, although acquitted on the underlying bribery charge, Nixon was convicted of perjury based on his grand jury testimony, and his conviction was subsequently affirmed. *See United States v. Nixon*, 816 F.2d 1022 (5th Cir.1987), *cert. denied*, 484 U.S. 1026, 108 S.Ct. 749, 98 L.Ed.2d 762 (1988).

In May 1989, the House of Representatives voted to impeach Nixon on three articles relating to his perjury. *See* 135 CONG. REC. H1811 (daily ed. May 10, 1989). The first two articles charged Nixon with giving false testimony to the grand jury and the last charged him with bring-

ing disrepute to the federal judiciary by way of his actions. *See id.* at H1802–03.

When these articles came before the Senate for trial, the Senate voted to empanel a special committee of 12 senators to hear witnesses and gather evidence. *See* S.Res. 128, 101st Cong., 1st Sess., 135 CONG. REC. S5199 (daily ed. May 11, 1989). This committee was established pursuant to Senate Impeachment Rule XI, an internal rule adopted in 1935 and first invoked in 1986 during the impeachment trial of former U.S. District Judge Harry Claiborne. Under Rule XI, the Senate may elect to delegate certain evidence-gathering responsibilities associated with an impeachment trial to a special 12–member committee, in lieu of conducting a full evidentiary hearing on the Senate floor. Although the rule does not prohibit it, in practice the committee has not been empowered to pass judgment on contested issues of fact or make any recommendations concerning the resolution of the impeachment charges. *See* S.Res. 128, *supra,* § 5. The committee is, however, fully authorized to hear witnesses, permit cross-examination and compile a record upon which the full Senate may act.[1]

Under established procedures, all members of the Senate are kept fully apprised of the committee's proceedings. The proceedings are broadcast live to all Senate offices and are also recorded on videotape which is made available to all senators. The committee also prepares a report summarizing both the undisputed facts of the case and the evidence relating to those which are contested. This report, along with a transcript of the committee's proceedings, is then passed along to the full Senate. Rule XI does not preclude the Senate from calling witnesses before the full body or from conducting further factual inquiries on the Senate floor. Prior to a final vote, the parties are permitted to make arguments before the full assembly.

Nixon protested the use of an evidentiary committee in his case and twice unsuccessfully asked the Senate to conduct all evidentiary proceedings on the Senate floor. The committee appointed to inquire into Nixon's case conducted four days of hearings in September 1989 and heard from 10 witnesses, including five defense witnesses and Nixon himself. *See* REPORT OF THE IMPEACHMENT TRIAL COMMITTEE ON THE ARTICLES AGAINST JUDGE WALTER L. NIXON, JR., S.REP. No. 164, 101st Cong., 1st Sess. 4 (1989). On October 16, 1989, the committee submitted its report to the full Senate, *see id.,* and the parties submitted final briefs shortly thereafter.

For three consecutive days, beginning November 1, 1989, the full Senate considered the question of Nixon's impeachment. On November 1, Nixon and the House impeachment managers were each allowed 90 minutes to present closing arguments on the Senate floor. *See* 135 CONG. REC. S14,494 (daily ed. Nov. 1, 1989). Nixon himself used some of that time to offer a personal appeal to the senators. *See id.* at S14,502–04. Following these arguments, the senators posed a number of written questions to the parties. *See id.* at

---

1. Rule XI provides:

[I]n the trial of any impeachment the Presiding Officer of the Senate, upon the order of the Senate, shall appoint a committee of twelve Senators to receive evidence and take testimony at such times and places as the committee may determine, and for such purpose the committee so appointed and the chairman thereof, to be elected by the committee, shall (unless otherwise ordered by the Senate) exercise all the powers and functions conferred upon the Senate and the Presiding Officer of the Senate, respectively, under the rules of procedure and practice in the Senate when sitting on impeachment trials.

Unless otherwise ordered by the Senate, the rules of procedure and practice in the Senate when sitting on impeachment trials shall govern the procedure and practice of the committee so appointed. The committee so appointed shall report to the Senate in writing a certified copy of the transcript of the proceedings and testimony had and given before such committee, and such report shall be received by the Senate and the evidence so received and the testimony so taken shall be considered to all intents and purposes, subject to the right of the Senate to determine competency, relevancy, and materiality, as having been received and taken before the Senate, but nothing herein shall prevent the Senate from sending for any witness and hearing his testimony in open Senate, or by order of the Senate having the entire trial in open Senate. S.IMP.R. XI, *reprinted in* SENATE MANUAL, S.DOC. No. 1, 98th Cong., 2d Sess. 174 (1984).

S14,513–16. On November 2, the full Senate deliberated on Nixon's guilt for six hours in closed session. On the final day, the Senate voted by the necessary two-thirds majority to convict Nixon on two of the three articles of impeachment.[2]

Nixon now challenges the constitutionality of the procedure used by the Senate in considering his impeachment. His argument is that the Constitution obligates "the Senate" to "try" impeachments and that this language entitles him to a full evidentiary hearing *on the floor of the Senate.* The Senate's use of a committee to gather evidence and hear witnesses, Nixon argues, fundamentally prejudiced his case and stripped the Senate's later deliberations of the judicial character required by the Constitution. In particular, Nixon contends that, although issues of credibility were central to the Senate's ultimate disposition of his case, only the 12 senators who served on the committee actually heard the witnesses testify in person. As evidence of the prejudice he suffered, Nixon offers an analysis of the final vote in his case which shows that senators who did not serve on the committee (and thus did not hear the witness testimony first-hand) were more likely to vote to convict than those senators who sat on the committee.[3]

Nixon first brought this challenge before the District Court in June 1989, when he intervened in a law suit brought by then-Judge Alcee Hastings, who was also facing impeachment proceedings. In that case, the District Court held Nixon's claim to be a nonjusticiable political question; this court affirmed the trial court's dismissal, but on the grounds that the claims were then premature in light of the fact that neither plaintiff had yet been convicted by the Senate. *See Hastings v. United States Senate,* 716 F.Supp. 38, 40 (D.D.C.), *aff'd mem. on other grounds,* 887 F.2d 332 (D.C.Cir.1989) (text of unpublished memorandum decision available on Westlaw).

Following the Senate's vote, Nixon renewed his constitutional challenge, seeking a declaration that his conviction by the Senate and subsequent removal were unconstitutional. In reply, the Government mounted a two-prong attack on the court's authority to hear Nixon's challenge. First, the Government renewed its insistence that the claim was a nonjusticiable political question. Second, it asserted that, even if the claim were justiciable, it could be heard only in the United States Claims Court, the exclusive forum in which the United States has waived its sovereign immunity to suits for large money damages. Because a finding in Nixon's favor on the merits might entitle him to back pay in excess of $10,-000, the Government reasoned, Nixon's suit was essentially one for money damages over which the Claims Court would have exclusive jurisdiction.

The District Court held that it had proper subject-matter jurisdiction over Nixon's suit but concluded, once again, that his claim was nonjusticiable under the political question doctrine. *See Nixon v. United States,* 744 F.Supp. 9, 13–14 (D.D.C.1990). In the District Court's view, the Senate's use of an evidentiary committee simply did not "result[ ] in the dimension of departure from the Constitution's textual commit-

---

**2.** The Senate voted 89–to–8 to convict Nixon on Article I and 78–to–19 to convict on Article II. *See* 135 Cong.Rec. S14,635 (daily ed. Nov. 3, 1989). Fifty-seven senators also voted to convict Nixon on Article III, *see id.* at S14,636, although this fell short of the two-thirds majority required by the Constitution, *see* U.S. Const. art. I, § 3, cl. 6.

**3.** On Article I, nine out of the 12 senators who served on the impeachment committee (75%) voted to convict, while fully 94% of senators off the committee favored conviction. On Article II, 58% of the committee members voted for conviction, compared to 84% of the remaining senators. On Article III, 42% of committee members, and 61% of the remaining senators, voted to convict. *See* Joint Appendix Tab 4.

This voting pattern has occurred in all three impeachments in which the Senate has used a committee to gather evidence—the impeachments of U.S. District Judges Claiborne, Alcee L. Hastings and Nixon. Aggregating all votes, senators who did not sit on the evidentiary committee favored conviction by almost a three-to-one margin, while those who served on the committee favored conviction by only a bare majority. *See* Brief of Appellant, Table 1, at 16 (senators not on the committee voted 71% of the time to convict; senators on the committee voted 53% of the time to convict).

ment to the Senate of the 'sole Power to try all Impeachments' as to make this controversy justiciable and the claim meritorious." *Id.* at 14.

Nixon now appeals the District Court's judgment.

## II. ANALYSIS

### A. *Subject–Matter Jurisdiction*

Before reaching the more difficult issues presented by Nixon's case, it is necessary to dispose of a claim by the appellees that the District Court lacked subject-matter jurisdiction. The appellees argue that Nixon's suit is essentially one for money damages in the form of back pay. *See* Brief for Appellees and Amicus Curiae United States Senate ("Appellees Br.") at 37. Because that back pay would now amount to more than $10,000, the appellees argue, exclusive jurisdiction lies under the Tucker Act in the Claims Court, the only forum in which the United States has waived its sovereign immunity to such suits. *See* 28 U.S.C. § 1491 (1988). The appellees are mistaken.

Nixon relies upon the waiver of sovereign immunity found in the Administrative Procedure Act. That Act waives sovereign immunity for actions "seeking relief other than money damages" that allege illegal action by a federal agency or officer. *See* 5 U.S.C. § 702 (1988). Nixon's suit clearly alleges illegal action by a federal agency or officer, namely, actions taken by federal officials to effectuate his removal from judicial office following his impeachment and assertedly unconstitutional conviction by the Senate.

Nixon's suit also qualifies as one "seeking relief other than money damages."

Nixon seeks only a declaration of the constitutional infirmity of his removal and of his entitlement to the pay and benefits of his former office; Nixon does *not* seek a judgment ordering the payment of any sum of money. Thus, "insofar as the complaint sought [only] declaratory ... relief, it was certainly not an action for money damages." *Bowen v. Massachusetts,* 487 U.S. 879, 893, 108 S.Ct. 2722, 2731, 101 L.Ed.2d 749 (1988); *see also Dronenburg v. Zech,* 741 F.2d 1388, 1389–90 (D.C.Cir.1984); *Schnapper v. Foley,* 667 F.2d 102, 107–08 (D.C.Cir.1981), *cert. denied,* 455 U.S. 948, 102 S.Ct. 1448, 71 L.Ed.2d 661 (1982).[4] Even if Nixon's suit might *later* give rise to some claim to monetary compensation, this fact would not render his instant suit one for "money damages." As this court has previously explained,

> even if a declaration by the district court could later be used as the basis for monetary relief, that possibility does not deprive the district court of authority to grant the requested relief. Declaratory relief is improper only if the plaintiffs' action is a mere pretext to avoid the exclusive jurisdiction of the Claims Court.

*Ramirez de Arellano v. Weinberger,* 745 F.2d 1500, 1533 (D.C.Cir.1984) (*en banc*) (footnotes omitted), *vacated on other grounds,* 471 U.S. 1113, 105 S.Ct. 2353, 86 L.Ed.2d 255 (1985); *see also Laguna Hermosa Corp. v. Martin,* 643 F.2d 1376, 1379 (9th Cir.1981). There is surely no basis on the record in this case for us to conclude that Nixon framed his complaint as one for declaratory relief merely as a pretext to avoid the Claims Court.

The appellees are correct in asserting that Nixon may not rely on the waiver of

---

**4.** Moreover, in the wake of the Supreme Court's decision in *Bowen,* it would appear that even had Nixon sought back pay in this action, his suit would still not be one for "money damages" within the meaning of 5 U.S.C. § 702. In *Bowen,* the Court explained:

> Our cases have long recognized the distinction between an action at law for damages—which are intended to provide a victim with monetary compensation for an injury to his person, property, or reputation—and an equitable action for specific relief—which may

include an order providing for *the reinstatement of an employee with back pay....*

487 U.S. at 893, 108 S.Ct. at 2731–32 (emphasis added); *see also DeVargas v. Mason & Hanger-Silas Mason Co.,* 911 F.2d 1377, 1381 n. 3 (10th Cir.1990) (citing *Bowen* for the proposition that "the bar on recovery of 'money damages' contained in 5 U.S.C. section 702 does not include equitable back[ ]pay, which is a form of equitable relief, not monetary damages"), *cert. denied,* —— U.S. ——, 111 S.Ct. 799, 112 L.Ed.2d 860 (1991).

sovereign immunity contained in the Administrative Procedure Act if he could obtain adequate relief in the Claims Court under the Tucker Act. *See* 5 U.S.C. §§ 702, 704 (1988); *see also* 14 C. WRIGHT, A. MILLER & E. COOPER, FEDERAL PRACTICE AND PROCEDURE § 3659 (2d ed. 1985 & Supp. 1991). But relief in that forum is limited largely to the awarding of monetary compensation. *See* 28 U.S.C. § 1491(a)(1) & (2) (1988); *see also Bowen v. Massachusetts*, 487 U.S. at 914–15, 108 S.Ct. at 2742–43 (Scalia, J., dissenting); *McEniry v. United States*, 7 Cl.Ct. 622, 625 ("It is clear that a plaintiff's *primary claim* must be one for monetary relief before this court can assert jurisdiction over the claim.") (emphasis added), *aff'd mem.*, 785 F.2d 323 (Fed.Cir. 1985). And, in this case, I am in total disagreement with the appellees' suggestion that a money judgment for back pay and benefits is all that Nixon seeks or all that he needs to cure his asserted constitutional injury. The injury Nixon alleges as a result of his removal goes far beyond the loss of his salary. It includes not only removal from the federal bench, but permanent disqualification from holding Government office. *See* U.S. CONST. art. I, § 3, cl. 7 (officers removed upon impeachment suffer "disqualification to hold and enjoy any Office of honor, Trust or Profit under the United States"). Given the nature of Nixon's injury, it appears obvious that "the doubtful and limited relief available in the Claims Court is not an adequate substitute for review in the District Court," *Bowen v. Massachusetts*, 487 U.S. at 901, 108 S.Ct. at 2736; *see also id.* at 904, 108 S.Ct. at 2737, and that Nixon therefore properly relied on the waiver of sovereign immunity found in 5 U.S.C. § 702.

Thus, I find that the District Court correctly asserted subject-matter jurisdiction over Nixon's claim and now turn to the appellees' invocation of the political question doctrine.

### B. *Justiciability*

The District Court found that, "[d]espite textual and historical indicators that the word 'try' carries with it some duty for Senators to sit as judge and jury, ... plain-tiff has not established the kind of clear violation of a specific constitutional requirement which would trigger judicial authority to review a solemn and serious Senate action." *Nixon*, 744 F.Supp. at 13. The District Court thus accepted the appellees' argument that, "[e]ven though plaintiff's challenge to the constitutionality of Rule XI raises a serious question," the matter cannot be considered on the merits because Nixon has raised a nonjusticiable "political question." *Id.* I disagree.

It is, of course, not enough to avoid judicial review for the Government to point out that this is a "political" case, in the sense that the judiciary is asked to declare invalid action by a coordinate branch of Government in performing one of its core "political" functions. As the Supreme Court has reminded us time and again, "the presence of constitutional issues with significant political overtones does not automatically invoke the political question doctrine," *INS v. Chadha*, 462 U.S. 919, 942–43, 103 S.Ct. 2764, 2779–80, 77 L.Ed.2d 317 (1983), and "courts cannot reject as 'no law suit' a bona fide controversy as to whether some action denominated 'political' exceeds constitutional authority," *Baker v. Carr*, 369 U.S. 186, 217, 82 S.Ct. 691, 710, 7 L.Ed.2d 663 (1962). Rather, what is required is a more "discriminating inquiry into the precise facts and posture of the particular case," *id.*, in an effort to determine whether the courts are genuinely incompetent to decide the matter.

Under the Supreme Court's landmark decision in *Baker v. Carr*, the political question doctrine comes into play only when,

[p]rominent on the surface of a[ ] case ... is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual

need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Id.* "Unless one of these formulations is inextricable from the case at bar," the Court concluded, "there should be no dismissal for nonjusticiability on the ground of a political question's presence." *Id.* Thus, the political question doctrine is narrowly confined; and, as history has shown, it is a rarely invoked limitation on judicial authority.

The appellees argue that Nixon's claim should be dismissed as nonjusticiable because of (i) a "textually demonstrable commitment" of impeachment questions to a coordinate branch, and (ii) the impossibility of deciding the case without expressing disrespect for the Senate. *See* Appellees Br. at 25–26. I reject both contentions.

1. "A Textually Demonstrable Commitment"

Article I, § 3, cl. 6, of the Constitution provides:

> The Senate shall have the sole Power to try all Impeachments. When sitting for that Purpose, they shall be on Oath or Affirmation. When the President of the United States is tried, the Chief Justice shall preside: And no Person shall be convicted without the Concurrence of two thirds of the Members present.

The District Court held that this provision is a "textually demonstrable commitment" of impeachment questions to a coordinate branch of Government. Thus, because the Constitution expressly delegates to the Senate "the sole Power" to try impeachments, and because the Senate gave Nixon some "semblance of a trial," *Nixon,* 744 F.Supp. at 14, the trial court ruled that it was without authority to dictate more precisely "the *type* of trial to be accorded," *id.* (emphasis in original); *accord Hastings,* 716 F.Supp. at 40–41.[5]

This sweeping view of nonjusticiability cannot be squared, however, with the Supreme Court's decisions in *Powell v. McCormack,* 395 U.S. 486, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969), and other more recent cases giving definition to the political question doctrine. A careful review of those cases is essential to a disposition of Nixon's claim.

Where the Constitution expressly assigns absolute discretion in a matter to the legislative or executive branch, the courts have no role to play in reviewing the exercise of that discretion. But, as the Court made clear in *Baker v. Carr,* not every constitutional assignment of power constitutes a "textually demonstrable constitutional commitment" within the contemplation of the political question doctrine. There are many broad delegations of authority to coordinate branches of Government that do not result in nonjusticiable questions merely by virtue of the breadth of the assigned authority. For example, the Constitution assigns to Congress the "Power ... To regulate Commerce with foreign Nations, and among the several States, and with the

---

5. The District Court's view finds support in a 1936 decision of the Court of Claims, which held that the courts are without power to review any aspect of Senate action in trying and removing a federal official. *See Ritter v. United States,* 84 Ct.Cl. 293 (1936), *cert. denied,* 300 U.S. 668, 57 S.Ct. 513, 81 L.Ed. 875 (1937). There is also support for this view among commentators, some of whom have suggested broadly, along the lines of the *Ritter* opinion, that *any* challenge to congressional handling of an impeachment would be precluded by the Constitution's absolute textual assignment of that power to the legislative branch. *See, e.g.,* C. BLACK, IMPEACHMENT: A HANDBOOK 63 (1974) ("the courts have ... no part at all to play" in reviewing Senate impeachment trials); J. NOWAK, R. ROTUNDA & J. YOUNG, CONSTITUTIONAL LAW § 2.15, at 109 (3d ed. 1986); C. WRIGHT, THE LAW OF FEDERAL COURTS § 14, at 81 (4th ed. 1983) ("Most commentators ... have adhered to the orthodox view that the courts have no role to play with regard to impeachment.") (footnote omitted); Rotunda, *An Essay on the Constitutional Parameters of Federal Impeachment,* 76 KY.L.J. 707, 728–32 (1987–1988); Wechsler, *Toward Neutral Principles of Constitutional Law,* 73 HARV.L.REV. 1, 8 (1959). These commentators argue that senators will be made sufficiently attentive to their constitutional duty by their accountability to the voters and that the courts should leave it to the political process to discipline any arguable abridgements of the Constitution. *See* Rotunda, *supra,* at 730; Tushnet, *Principles, Politics, and Constitutional Law,* 88 MICH.L.REV. 49, 57–58 (1989).

Indian Tribes," U.S. CONST. art. I, § 8, cl. 3, and yet no one reasonably would suggest that it is beyond the authority of the courts to review congressional enactments regulating interstate commerce. *Cf. County of Oneida, N.Y. v. Oneida Indian Nation of N.Y. State,* 470 U.S. 226, 249, 105 S.Ct. 1245, 1259, 84 L.Ed.2d 169 (1985) ("Congress' plenary power in Indian affairs under Art. I, § 8, cl. 3, does not mean that litigation involving such matters necessarily entails nonjusticiable political questions"). Rather, what makes a "textually demonstrable commitment" is not merely a textual assignment of power, but a textual assignment of *absolute discretion* in a particular matter to a coordinate branch.

The distinction at times may seem elusive, but it is usefully illuminated by comparing two lines of cases interpreting the same clause of the Constitution. Article I provides that "Each House shall be the Judge of the Elections, Returns and Qualifications of its own Members." U.S. CONST. art. I, § 5, cl. 1. Because this clause unequivocally states that each house of Congress—rather than the courts—shall be "the Judge" of these matters, it has been held that courts may not consider a claim that the House or Senate seated the wrong candidate following a contested congressional election. There being no dispute in these cases that the Senate or House has in fact "judged" the election returns, but only that it got the factual result wrong, there can be no dispute that the final word on the counting of ballots has been assigned outside the judiciary. *See Roudebush v. Hartke,* 405 U.S. 15, 19, 92 S.Ct. 804, 807–08, 31 L.Ed.2d 1 (1972) (dicta); *Webster v. Doe,* 486 U.S. 592, 612, 108 S.Ct. 2047, 2058, 100 L.Ed.2d 632 (1988) (Scalia, J., dissenting); *Morgan v. United States,* 801 F.2d 445, 447 (D.C.Cir.1986) (Scalia, J.), *cert. denied,* 480 U.S. 911, 107 S.Ct. 1359, 94 L.Ed.2d 529 (1987); *McIntyre v. Fallahay,* 766 F.2d 1078, 1081 (7th Cir.1985). If courts were permitted to review a congressional decision to seat a particular candidate by recounting the ballots or scrutinizing other findings of fact, the judiciary, and not the Congress, would in the last analysis be "the Judge" of election returns.

The Supreme Court considered a somewhat different claim grounded in the same clause, however, in *Powell v. McCormack,* and there found the issue justiciable. In that case, Congressman Adam Clayton Powell, Jr., challenged a House of Representatives' decision barring Powell from taking his seat. The House, citing alleged financial misconduct, contended that it had "judged" Powell unqualified to serve as a member. Powell argued that "Qualifications" under article I, section 5, must be construed to include only the standing requirements expressly listed in the Constitution itself (*i.e.,* age, citizenship and residency), while the House insisted that the Constitution assigned nonreviewable discretion to the Congress to define and judge those "Qualifications" for itself.

The Supreme Court held that Powell's challenge did *not* present a nonjusticiable political question. The Court began its analysis by observing the paradox that an assessment of whether a constitutional claim is reviewable unavoidably requires that judges initially review the relevant constitutional language and give it content. "In order to determine whether there has been a textual commitment to a co-ordinate department of the Government," the Court wrote, "we must interpret the Constitution." 395 U.S. at 519, 89 S.Ct. at 1963. Accordingly, the Court undertook an extensive review of the text and historical practice concerning legislative qualification and exclusions and concluded that the framers intended the term "Qualifications" to include only those standing requirements listed in article I, section 2, of the Constitution:

> In short, both the intention of the Framers, to the extent it can be determined, and an examination of the basic principles of our democratic system persuade us that the Constitution does not vest in the Congress a discretionary power to deny membership by a majority vote.

*Id.* at 548, 89 S.Ct. at 1978. Consequently, the Court held that Congress' textual authority to be "the Judge" of the "Qualifications" of its members did *not* empower Congress to be "the Judge" of what the

Constitution means by "Qualifications"; that task remained with the courts. Rather, "Art. I, § 5, is at most a 'textually demonstrable commitment' to Congress to judge only the qualifications expressly set forth in the Constitution." *Id.* While challenges to Congress' factual rulings on age, citizenship and residency might be nonjusticiable, the Court held, a claim that Congress had exceeded the textual bounds of its authority by excluding a member on grounds other than his constitutional "Qualifications" is amenable to judicial review. *See id.* at 520-22 & n. 42, 89 S.Ct. at 1963-64 & n. 42.

It is clear from the Supreme Court's rulings in *Powell* and *Roudebush,* then, that while the courts may well be barred from second-guessing Congress' fact-finding and policy judgments within the zones of discretion assigned it by the Constitution, the courts *may* review claims that Congress has exceeded an explicit textual limitation on its powers.

The justiciability of Nixon's claim is directly controlled by *Powell.* I recognize that a challenge to the factual findings underlying the Senate's conviction, *e.g.,* a claim that the party convicted had not actu-

ally committed the misconduct of which he was accused, would almost certainly be nonjusticiable—just as *Powell* suggested that a fact-based challenge to the exclusion of a member for failing to satisfy the standing requirements of age, citizenship or residency might be, *see* 395 U.S. at 521 n. 42, 89 S.Ct. at 1963 n. 42, and as *Roudebush* and *Morgan* suggested that a claim that the Senate or House had misjudged the returns in a close election would be. A claim, however, that the Senate exceeded the textual bounds of its authority by convicting a judge on articles of impeachment without first "try[ing]" him within the constitutional meaning of that term—as Nixon claims in this case—*is* justiciable. Unlike the plaintiff in *Morgan,* who effectively asked this court to supplant the House as "the Judge" of an election, Nixon does not ask us to supplant the Senate as the "tr[ier]" of his impeachment; he asks only that we review the Senate's conduct to ensure that *it* in fact tried him as required by the Constitution. It is the courts' task to interpret and give content to the word "try," just as it was the Court's job in *Powell* to give meaning to the word "Qualifications." [6]

---

**6.** The majority emphasizes that the Senate enjoys not merely the constitutional power of trying impeachments, but the *"sole* Power" of trying impeachments. But the presence of the word "sole" does not answer the question presented in this case. That the framers intended that the Senate, and no one else, would "try all Impeachments" does not tell us what the framers would have intended in the situation presented here, where the Senate has assertedly abdicated the power assigned it by removing Nixon without trial. Accordingly, historical evidence that the framers decided against permitting courts to *try impeachments* is simply not dispositive of the justiciability of Nixon's claim. We are not called upon today to "try" Nixon's impeachment, but merely to determine whether the Senate did so.

It is for this same reason that the majority's reliance on *Roudebush* is inapt. Although the Court there suggested that courts have no power to review the Senate's performance of its constitutional role of "judging" election contests, it did *not* address whether courts also would be powerless to intercede where the Senate had *refused* to carry out that constitutional function. As one commentator explained:

> The lesson of *Powell* is that the Supreme Court may use judicial review to determine whether Congress followed the proper proce-

dure for making the political decision committed to it by the Constitution. *Powell* does not allow overly intrusive judicial review, but rather allows review solely to ensure that Congress made the particular kind of political decision entrusted to it by the Constitution.

Gerhardt, *The Constitutional Limits to Impeachment and Its Alternatives,* 68 Tex.L.Rev. 1, 99-100 (1989); *accord* R. Berger, Impeachment: The Constitutional Problems 116-19 (1973); Henkin, *Is There a "Political Question" Doctrine?,* 85 Yale L.J. 597, 605 n. 26 (1976) ("Even the unique [textual] instance, '[t]he Senate shall have the *sole* Power to try all Impeachments,' does not necessarily preclude the argument that while the Senate alone is to be the judge in impeachment proceedings, the courts can review how it does it, at least for constitutional excesses or infirmities.") (emphasis in original); Tushnet, *supra* note 5, at 57 (agreeing that *Powell* compels the conclusion that such questions are justiciable); *cf. Mitchell v. Laird,* 488 F.2d 611, 614-15 (D.C.Cir.1973) (Wyzanski, J., by designation) (political question doctrine would not bar court from deciding "whether the hostilities in Indo-China constitute in the Constitutional sense a 'war'" within the meaning of art. I, § 8, cl. 11, but "we deem it a political question ... for Congress to decide in which form, if any, it will

The District Court also suggested that judicial review of Nixon's claim might be foreclosed by the Constitution's textually demonstrable assignment to the Senate of the power to "determine the Rules of its Proceedings." U.S. CONST. art. I, § 5, cl. 2; *see Nixon*, 744 F.Supp. at 13, 14. But this assignment of power, like the assignment of power to Congress to regulate interstate commerce or to provide for the general welfare, may be exercised only within the constraints of other constitutional provisions.[7] The Senate could not, for example, constitutionally pass a "rule" allowing conviction and removal of impeached officers by a majority vote,[8] and the fact that the Senate's action had been taken pursuant to its "rulemaking" authority would provide no shield against judicial invalidation. As this court has previously explained, "Art. I[, § 5, cl. 2,] simply means that neither we nor the Executive Branch may tell Congress what rules it must adopt. Article I does not alter our judicial responsibility to say what rules Congress may not adopt because of constitutional infirmity." *Vander Jagt v. O'Neill*, 699 F.2d 1166, 1173 (D.C.Cir.), *cert. denied*, 464 U.S. 823, 104 S.Ct. 91, 78 L.Ed.2d 98 (1983).[9] Here, Nixon alleges that the Senate, by way of Rule XI, has violated an explicit textual limitation on its powers by removing him without first "try[ing]" him. We may well disagree with Nixon on the merits, but that disagreement is not grounds for finding his claim nonjusticiable.

The District Court in this case went astray by taking essentially the opposite approach—first finding that the Senate had not committed a clear constitutional violation and then finding that its action was somehow consequently beyond judicial review. *See Nixon*, 744 F.Supp. at 13 ("[P]laintiff has not established the kind of clear violation of a specific constitutional requirement which would trigger judicial authority to review a solemn and serious Senate action."). It appears that, for the District Court, "[t]he issue on justiciability turns ultimately" upon the merits of Nixon's claim, *i.e.*, "on the narrow question of whether the Senate's specific denial of this plaintiff's motions for leave to take testimony before the open Senate denied him the kind of trial clearly guaranteed to him by the Constitution." *Id.* By this approach, however, the finding of nonjusticiability becomes largely a shorthand label for the court's ultimate conclusion that there has been no constitutional violation, or, to put it more precisely, that the governmental defendant did not exceed the bounds of the discretionary authority assigned it by the Constitution. *See generally* Henkin, *supra* note 6, at 601, 605–06.[10] It is mis-

give its consent to the continuation of a war already begun by a President acting alone").

7. Nearly a century ago, the Supreme Court observed:

> The Constitution empowers each house to determine its rules of proceedings. It may not by its rules ignore constitutional restraints .or violate fundamental rights, and there should be a reasonable relation between the mode or method of proceeding established by the rule and the result which is sought to be attained. But *within these limitations* all matters of method are open to the determination of the house, and it is no impeachment of the rule to say that some other way would be better, more accurate or even more just.... [This rulemaking power] is[,] ... *within the limitations suggested,* absolute and beyond the challenge of any other body or tribunal.

*United States v. Ballin,* 144 U.S. 1, 5, 12 S.Ct. 507, 509, 36 L.Ed. 321 (1892) (emphasis added).

8. *See* U.S. CONST. art. I, § 3, cl. 6 ("And no Person shall be convicted without the Concurrence of two thirds of the Members present.").

9. In *Vander Jagt,* 14 Republican congressmen sued the Democratic leadership of the House of Representatives, alleging that the Democrats were allocating disproportionately few seats on key committees to the minority party, in violation of the Republicans' Fifth Amendment rights. The District Court found the matter nonjusticiable under the political question doctrine, in part because article I, section 5, of the Constitution assigns to the House the power to "determine the Rules of its Proceedings." *Vander Jagt v. O'Neill,* 524 F.Supp. 519, 521 (D.D.C. 1981). On review, this court reversed the trial court's justiciability ruling. Although the court went on, for prudential reasons, to decline to exercise its discretionary remedial authority, it made clear that the political question doctrine presented no bar to the court's review. *See* 699 F.2d at 1173–74, 1177.

10. Professor Henkin argues that this approach characterizes virtually all of the cases in which courts have claimed to find nonjusticiable "political questions":

> The cases which are supposed to have established the political question doctrine required

leading, however, to suggest in such an instance that the court has declined to engage in judicial review. If the political question doctrine is to have any integrity as a constraint upon judicial review, its invocation must arise from an analysis of the Constitution that stands apart from any conclusion on the merits of the particular claim presented.

Consequently, adhering to the Supreme Court's guidance in *Powell*, I reject the argument that Nixon's challenge is nonreviewable because of a "textually demonstrable commitment" of the issue to a coordinate branch.

### 2. Disrespect to the Senate

Alternatively, the appellees argue that Nixon's claim should be held nonjusticiable because of "the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government." *Baker*, 369 U.S. at 217, 82 S.Ct. at 710; *see* Appellees Br. at 28–29. Judicial review of the Senate's decision to employ a committee in trying impeachments would be particularly insulting, the Government argues, because the record reveals that the Senate gave thoughtful and careful consideration to the constitutionality of its decision. *See* Appellees Br. at 28, 49–50.

This claim, too, however, must be rejected in light of the Supreme Court's holdings in *Powell* and subsequent cases. In *Powell*, the Court rejected the notion that its ruling invalidating the House of Representatives' exclusion of Powell would express disrespect for the House. The Court stated summarily:

> Our system of government requires that federal courts on occasion interpret the Constitution in a manner at variance with

the construction given the document by another branch. The alleged conflict that such an adjudication may cause cannot justify the courts' avoiding their constitutional responsibility.

*Powell*, 395 U.S. at 549, 89 S.Ct. at 1978 (footnote omitted); *accord United States v. Munoz-Flores*, —— U.S. ——, 110 S.Ct. 1964, 1968–69, 109 L.Ed.2d 384 (1990); *Goldwater v. Carter*, 444 U.S. 996, 1001, 100 S.Ct. 533, 536, 62 L.Ed.2d 428 (1979) (Powell, J., concurring in the judgment) ("Interpretation of the Constitution does not imply lack of respect for a coordinate branch."). If the Court may respectfully inform the House that it has unconstitutionally excluded one of its own members, it surely may respectfully inform the Senate that it has unconstitutionally convicted a judge without "try[ing]" him in an impeachment. Indeed, were we to accept the Government's view of what constitutes "disrespect" to a coordinate branch, "*every* judicial resolution of a constitutional challenge to a congressional [action] ... would be impermissible." *Munoz-Flores*, 110 S.Ct. at 1968 (emphasis in original).

The fact that the Senate vigorously debated the constitutionality of its actions likewise fails to render Nixon's claim nonjusticiable. The Supreme Court pointedly rejected this suggestion only last year:

> Congress often explicitly considers whether bills violate constitutional provisions. Because Congress is bound by the Constitution, its enactment of any law is predicated at least implicitly on a judgment that the law is constitutional.... Yet such congressional consideration of constitutional questions does not foreclose subsequent judicial scrutiny of the laws' constitutionality. On the contrary, this Court has the duty to review the

---

no such extra-ordinary abstention from judicial review; they called only for the ordinary respect by the courts for the political domain. Having reviewed, the Court refused to invalidate the challenged actions because they were within the constitutional authority of President or Congress. In no case did the Court have to use the phrase "political question," and when it did, it was using it in a different sense, saying in effect: "We have reviewed your claims and we find that the action com-

plained of involves a political question, and is within the powers granted by the Constitution to the political branches. The act complained of violates no constitutional limitation on that power, either because the Constitution imposes no relevant limitations, or because the action is amply within the limits prescribed. We give effect to what the political branches have done because they had political authority under the Constitution to do it."

Henkin, *supra* note 6, at 601 (footnote omitted).

constitutionality of congressional enactments.

*Id.* at 1968–69 (citations omitted).

In light of these admonitions from the Supreme Court, we cannot agree with the appellees that judicial review of Nixon's claim is foreclosed because it might express disrespect for the Senate.

### 3. Conclusion on Justiciability

This court has previously acknowledged that "[t]he political question doctrine is a tempting refuge from the adjudication of difficult constitutional claims." *Ramirez de Arellano v. Weinberger,* 745 F.2d 1500, 1514 (D.C.Cir.1984) (*en banc*), *vacated on other grounds,* 471 U.S. 1113, 105 S.Ct. 2353, 86 L.Ed.2d 255 (1985). And, yet, cognizant that "courts cannot reject as 'no law suit' a bona fide controversy as to whether some action denominated 'political' exceeds constitutional authority," *Baker v.*

*Carr,* 369 U.S. at 217, 82 S.Ct. at 710, and that the "shifting contours and uncertain underpinnings [of the political question doctrine] make it susceptible to indiscriminate and overbroad application to claims properly before the federal courts," *Ramirez de Arellano,* 745 F.2d at 1514, we have been diligent in resisting the temptation.

The narrow scope of the political question doctrine is evident from the Supreme Court's treatment of the issue in recent cases. In the nearly 30 years since *Baker v. Carr,* the Supreme Court has turned aside assertions of nonjusticiability under the doctrine in more than a dozen cases.[11] In only one, *Gilligan v. Morgan,* 413 U.S. 1, 93 S.Ct. 2440, 37 L.Ed.2d 407 (1973), has the Court held that a case presented a nonjusticiable political question, and it is plain that *Gilligan's* holding does not extend far beyond the unique facts of that case.[12]

---

11. *See United States v. Munoz–Flores,* —— U.S. ——, 110 S.Ct. 1964, 1968–71, 109 L.Ed.2d 384 (1990); *Quinn v. Millsap,* 491 U.S. 95, 102, 109 S.Ct. 2324, 2329, 105 L.Ed.2d 74 (1989); *Japan Whaling Ass'n v. American Cetacean Soc'y,* 478 U.S. 221, 229–30, 106 S.Ct. 2860, 2865–66, 92 L.Ed.2d 166 (1986); *Davis v. Bandemer,* 478 U.S. 109, 118–27, 106 S.Ct. 2797, 2802–08, 92 L.Ed.2d 85 (1986); *County of Oneida, N.Y. v. Oneida Indian Nation of N.Y. State,* 470 U.S. 226, 248–50, 105 S.Ct. 1245, 1258–60, 84 L.Ed.2d 169 (1985); *INS v. Chadha,* 462 U.S. 919, 940–43, 103 S.Ct. 2764, 2778–80, 77 L.Ed.2d 317 (1983); *Delaware Tribal Bus. Comm. v. Weeks,* 430 U.S. 73, 83–84, 97 S.Ct. 911, 918–19, 51 L.Ed.2d 173 (1977); *Elrod v. Burns,* 427 U.S. 347, 351–53, 96 S.Ct. 2673, 2678–80, 49 L.Ed.2d 547 (1976) (plurality opinion); *Stanton v. Stanton,* 421 U.S. 7, 11, 95 S.Ct. 1373, 1376, 43 L.Ed.2d 688 (1975); *United States v. Nixon,* 418 U.S. 683, 692–97, 94 S.Ct. 3090, 3099–03, 41 L.Ed.2d 1039 (1974); *Powell v. McCormack,* 395 U.S. 486, 516–49 (1969); *Williams v. Rhodes,* 393 U.S. 23, 28, 89 S.Ct. 5, 9, 21 L.Ed.2d 24 (1968); *Reynolds v. Sims,* 377 U.S. 533, 582, 84 S.Ct. 1362, 1392, 12 L.Ed.2d 506 (1964); *Wesberry v. Sanders,* 376 U.S. 1, 5–7, 84 S.Ct. 526, 528–30, 11 L.Ed.2d 481 (1964).

In other cases, the Court has narrowly construed the doctrine without expressly ruling on its application. *See, e.g., Davis v. Passman,* 442 U.S. 228, 235 n. 11, 99 S.Ct. 2264, 2272, 60 L.Ed.2d 846 (1979). In still others, the Court, without addressing the question of justiciability, "has passed on a variety of issues that previously would have been thought not to be justiciable." C. WRIGHT, *supra* note 5, § 14, at 77.

12. The Court's finding of nonjusticiability in *Gilligan* was dictated more by the extraordinary remedy sought than by the legal or constitutional questions presented. The plaintiffs in that case had brought a challenge under 42 U.S.C. § 1983, in the wake of the 1970 Kent State tragedy, to the way in which Ohio trained and supervised its National Guard. As relief, the plaintiffs did not seek damages but rather an injunction against future constitutional violations and, specifically, court supervision of future Guard policies and activities. *See Gilligan,* 413 U.S. at 5–6, 93 S.Ct. at 2443–44. Six Justices (Douglas, Brennan, Stewart, Marshall, Blackmun & Powell, JJ.) considered the plaintiffs' core claims to have been mooted by subsequent voluntary efforts by Ohio to reform its Guard, including the institution of new training programs. *See id.* at 12, 93 S.Ct. at 2446–47 (Douglas, Brennan, Stewart & Marshall, JJ., dissenting); *id.* at 13, 93 S.Ct. at 2447 (Blackmun, J., concurring). A majority of the Court also held that to the extent the plaintiffs sought continuing judicial supervision against possible *future* Guard abuses, they had presented a nonjusticiable political question. *See id.* at 7–8, 10, 93 S.Ct. at 2444–45, 2445–46. As Justice Blackmun explained in his concurring opinion:

This case relates to prospective relief in the form of judicial surveillance of highly subjective and technical matters involving military training and command. As such, it presents an "[inappropriate] ... subject matter for judicial consideration," for respondents are asking the District Court, in fashioning that prospective relief, "to enter upon policy determinations for which judicially manageable standards are lacking."

It is against this backdrop that we must consider Nixon's case. Because Nixon has alleged that the Senate exceeded an explicit textual limitation on its authority by convicting him without first "try[ing]" him in the sense required by the Constitution, I conclude that the courts are competent to hear his claim. At oral argument, counsel for the Government implicitly conceded this court's authority to review Nixon's claim by agreeing that this court *could* review a claim that the Senate had unconstitutionally delegated its authority to try impeachments to a randomly chosen group of schoolchildren, reserving to itself only the task of formally approving whatever result that group recommended. In both this case and that hypothetical, however, the basis for the constitutional claim is identical: that the Senate has not "tried" the accused within the meaning of the Constitution. If the court is competent to hear one claim, it must be competent to hear the other.

Because I find this case squarely controlled by *Powell v. McCormack,* I conclude that Nixon's claim is justiciable.

## C. *The Merits*

Resolution of the merits of Nixon's claim requires an exploration of the text of the Constitution and the history of its framing in an effort to determine what is meant by the constitutional requirement that the Senate "try" impeachments.[13] To that end, I look first to the words used by the framers, both in the text of the Constitution and in other documents reflective of their understanding, and then to historical practice, both in America and in England. These inquiries lead me to conclude that the Senate's use of a committee to gather evidence and hear witnesses relating to the charges against Nixon did not deprive Nixon of any constitutionally protected right.

### 1. Theoretical Framework

It is plain enough that the framers, by assigning to the Senate the task of "try[ing] all Impeachments," intended that senators would act in a quasi-judicial capacity in convicting and removing high federal officials. By using a word used elsewhere in the Constitution to refer to judicial proceedings, the framers appeared to reveal an intention that Senate impeachment "trials" would bear some rough likeness to the sort of "trials" carried out in criminal courtrooms. In providing for criminal jury trials, for example, the framers were careful to except impeachment trials. *See* U.S. CONST. art. III, § 2, cl. 3 ("The Trial of all Crimes, except in Cases of Impeachment, shall be by jury....."). While this express exception suggests that the framers did not intend to require the Senate to observe all procedural incidents of criminal trials, it also suggests that the framers may have thought of an impeachment trial as a type of criminal trial. Consequently, the Constitution's use of the word "try" to describe the Senate's function in rendering impeachment judgments implies a duty to accord at least the rudimentary hallmarks of judicial fact-finding, including the receipt of evidence, the examination of witnesses, right

---

*Id.* at 14, 93 S.Ct. at 2448 (Blackmun, J., concurring) (quoting *Baker v. Carr,* 369 U.S. at 198, 226, 82 S.Ct. at 699–700, 715: bracketed material in original); *see also* Henkin, *supra* note 6, at 619–22 (noting the aberrational posture of the *Gilligan* case and concluding: "It was something closer to denying an equitable remedy, than to abstaining from judicial review and dismissing for nonjusticiability, that the Supreme Court may have been (and should have been) about" in *Gilligan* ).

13. Although the District Court did not purport to reach the merits of Nixon's claim, we would not be required to remand to the trial court for initial review of the merits. Because the factual record was fully developed below and because the merits were fully briefed and argued both in this court and in the trial court, appellate review would cause no "undue surprise or prejudice." *Grace v. Burger,* 665 F.2d 1193, 1197 n. 9 (D.C.Cir.1981), *aff'd in part & vacated in part on other grounds sub nom. United States v. Grace,* 461 U.S. 171, 103 S.Ct. 1702, 75 L.Ed.2d 736 (1983). Indeed, to the contrary, "a remand to the District Court, which inevitably would result in a future appeal to this court, 'would be a waste of judicial resources.'" *Id.* (quoting *United States v. Aulet,* 618 F.2d 182, 186 (2d Cir. 1980)); *see also Powell,* 395 U.S. at 550 (no remand necessary following Court's reversal of lower court's finding of nonjusticiability where only facts essential to disposition were already conclusively established).

to counsel and a chance for hearing by the accused.

The inference that the framers intended impeachment trials to be roughly akin to criminal trials is reinforced by seemingly unrefuted statements made by Alexander Hamilton during the ratification debates. In *The Federalist No. 65*, for example, Hamilton wrote that the Senate, in trying impeachments, would act in a "judicial character as a court." THE FEDERALIST NO. 65, at 439 (A. Hamilton) (J. Cooke ed. 1961). Hamilton described the purpose of impeachment as a "NATIONAL INQUEST into the conduct of public men" in which the ultimate aim of the trial was a "real demonstration[] of innocence or guilt." *Id.* at 440.

The framers' determination that the Senate should have the sole authority to try impeachment cases reflected their desire to harness the forces of partisanship in such matters and to elevate the influence of reason, objectivity and fairness. *See id.* at 440–42.[14] As Hamilton noted, the Senate

was seen to "possess the degree of credit and authority, which might, on certain occasions, be indispensable, towards reconciling the people to a decision, that should happen to clash with an accusation brought by their immediate representatives." *Id.* at 441. Hamilton also recognized that there were advantages to be gained in trying impeachments in a "tribunal more numerous than would consist with a reasonable attention to economy," as with a judicial tribunal. *Id.*

In further explaining why impeachment trials were assigned to the Senate rather than to a court, however, Hamilton wrote:

[Impeachment proceedings] can never be tied down by such strict rules, either in the delineation of the offence by the prosecutors, or in the construction of it by the Judges, as in common cases serve to limit the discretion of courts in favor of personal security.

*Id.* Instead, it was unavoidable, Hamilton wrote, that a court of impeachment, sitting in judgment of officials charged with es-

---

**14.** *See* R. BERGER, *supra* note 6, at 79 n. 130 (quoting Jefferson as warning: "history shows, that in England, impeachment has been an engine more of passion than of justice"). The framers intended that impeachment serve as a check against abuses of power by the judiciary or the executive, and yet they were also alert to the danger that impeachment itself might be abused as a crude bludgeon against political opponents. *See* THE FEDERALIST NO. 65, *supra*, at 444 (urging that prompt Senate trial might be needed to check "persecution ... [by] an intemperate or designing majority in the House of Representatives"); *see also* P. HOFFER & N. HULL, IMPEACHMENT IN AMERICA, 1635–1805, at 99 (1984).

This concern is also reflected in the requirement that conviction be voted by a two-thirds, rather than a simple, majority:

[Impeachment decisions] should not be "popular." The Constitution assigned this labor to the Senate because the delegates expected the upper house to rely upon its own wisdom, information, stability, and even temper. There was no occasion, Hamilton opined, upon which the Senate should be more deliberative and shielded from popular clamors than when it sat to hear impeachments.

*Id.* at 106; *see also id.* at 99 ("Later [after the Constitutional Convention], both James McHenry and Luther Martin of Maryland recalled that the Senate seemed to be the only body likely to view impeachments in a cool and dispassionate manner.") (footnote omitted); Address of James McHenry before the Maryland House of Del-

egates (Nov. 29, 1787) ("[T]he power of trying impeachments was lodged with this Body [the Senate] as more likely to be governed by cool and candid investigation, than by those heats that too often inflame and influence more populous Assemblys."), *reprinted in* III THE RECORDS OF THE FEDERAL CONVENTION OF 1787, at 144, 148 (M. Farrand rev. ed. 1966) [hereinafter M. FARRAND]; Remarks of Luther Martin upon the Impeachment Trial of Justice Chase (Feb. 23, 1804), *reprinted in* III M. FARRAND, *supra*, at 406. In this regard, the framers may well have drawn upon lessons from English history, in which the House of Lords stood as a steadying check against the House of Commons' willingness to impeach, on the basis of political disagreement, officials who had committed no conduct that could be considered treasonous or otherwise unlawful. *See* P. HOFFER & N. HULL, *supra*, at 5–6; Roberts, *The Law of Impeachment in Stuart England: A Reply to Raoul Berger*, 84 YALE L.J. 1419 (1975).

Consequently, the framers "designed a deliberately cumbersome removal mechanism ... to provide additional protection of the judiciary against congressional politics." Edwards, *Regulating Judicial Misconduct and Divining "Good Behavior" for Federal Judges*, 87 MICH.L.REV. 765, 767 (1989); *see also* THE FEDERALIST NO. 79, at 533 (A. Hamilton) (J. Cooke ed. 1961) (constitutional impeachment mechanism "is the only provision on the point[] which is consistent with the necessary independence of the judicial character").

sentially "political" offenses, *id.* at 439 (original capitalization omitted), would be left to exercise an "awful discretion" in carrying out its task, *id.* at 441. The Senate was best fitted to serve in this capacity, the framers reasoned, because its relative insulation from the electorate would give it the necessary independence of judgment and its paramount prestige would give that judgment the credibility and authority that might be required to command adherence from an "agitate[d]" and "divide[d]" people. *See id.* at 439, 441.

From all of these statements, it can be reasonably inferred that the framers intended that the Senate would approach its duty of trying impeachments with the solemnity and impartiality befitting judicial action but with greater procedural flexibility than attends ordinary criminal trials. *See* Gerhardt, *supra* note 6, at 89–91.[15]

### 2. Historical Practice

From the beginning, historical practice confirmed the framers' understanding that impeachment trials would occupy a middle ground between the free-wheeling partisanship of legislative decisionmaking and the rigid procedural formalities of judicial criminal trials. From the earliest state and federal impeachments, it was agreed that "[s]trict adherence to criminal procedure would hamstring the jurisdiction of the upper house, for the senators were not jurors, and the offenses need not be crimes." P. HOFFER & N. HULL, *supra* note 14, at 125. "At the same time, the defendant was allowed many of the protections guaranteed in a criminal trial." *Id.*[16]

The question remains, despite the consensus that an "[i]mpeachment trial was to be distinguished from regular trials at law," *id.,* whether the use of special committees to receive evidence is consistent with the framers' theoretical framework, *i.e.,* whether the greater procedural flexibility accorded the Senate in "try[ing]" impeachments is broad enough to permit the use of evidentiary committees. American historical practice on this point arguably is weighted toward trial by the full Senate, for the Senate employed an impeachment trial committee for the first time only in 1986. *But see* Part II.C.2.b *infra.* There is precedent from England, however, supporting the use of committees, and this English practice may be read to suggest that the framers did not intend to foreclose the possibility in American constitutional practice.

### a. English Practice

The constitutional framework for impeachments was modeled after the English experience of bringing impeachments in the House of Commons followed by trial before the House of Lords. *See* THE FEDERALIST No. 65, *supra,* at 440. Although it is probably an overstatement to say that "almost the entire process [of American impeachments] was lifted bodily from English practice," *see* R. BERGER, *supra* note 6, at 179 (footnote omitted), there is no doubting the significant influence that English impeachment practice had on impeachment theory and practice under the American constitution.[17]

---

15. I have already noted that the Constitution itself was careful to except impeachment trials from the obligation to try criminal cases before a jury. *See* U.S. CONST. art. III, § 2, cl. 3. In addition, the Constitution expressly limits the penalties that may be imposed upon conviction on impeachment to removal from office and future disqualification, *see* U.S. CONST. art. I, § 3, cl. 7, reserving more serious penal consequences, such as incarceration, for criminal conviction.

16. "This understanding," hammered out in early impeachment trials of state officials by state legislatures, "was reiterated at the [federal] impeachment trials of ex-senator William Blount, federal judge John Pickering, and Supreme

Court Justice Samuel Chase, though the extent of allowable deviation from criminal procedure was subject to controversy." P. HOFFER & N. HULL, *supra* note 14, at 125 (footnote omitted).

17. The chief scholarly controversy appears to center upon whether the Constitution's impeachment provisions were more directly influenced by English impeachment practice or by the early colonial experiments with impeachment. *Compare* R. BERGER, *supra* note 6, at 54–55 & n. 9, 76, 84–85, 90, 171 & n. 217 (emphasizing English influence) *with* P. HOFFER & N. HULL, *supra* note 14, at xii, 96–97, 268 (emphasizing influence of state and colonial impeachment practices and criticizing Berger's reliance on English precedent) *and* Gerhardt, *supra* note 6,

Although the House of Lords did not adhere strictly to any single procedure for trying impeachments in the years leading up to the American Constitutional Convention, the Lords were careful, at least as of the early 1600s, to afford the accused certain procedural safeguards, such as the right to counsel and a limited right to discovery. *See* P. HOFFER & N. HULL, *supra* note 14, at 5; Williams, *The Historical and Constitutional Bases for the Senate's Power To Use Masters or Committees To Receive Evidence in Impeachment Trials,* 50 N.Y.U.L.REV. 512, 523–25 (1975). Over these years, "the English trial process was in a state of evolutionary flux," and "[t]he American Founding Fathers were well aware of the unsettled character of English impeachment proceedings." Williams, *supra,* at 523.

In English practice, most impeachment trials were conducted before the full assembly of the House of Lords, just as American impeachments were customarily tried in their entirety before the full Senate. There were, however, exceptions in which the House of Lords employed special committees to receive evidence in advance of final consideration and a vote by the full body. A review of English impeachment precedent

> shows beyond doubt that the House of Lords used committees to hear evidence during impeachment trials in the early 17th Century. It is difficult to determine definitively whether this practice continued, as no direct reference to the use of committees during later impeachment trials has been discovered. It is clear, however, that, unlike other practices which were outlawed by affirmative action of

the House of Lords, the use of committees to take evidence and examine witnesses has never been banned or disavowed as precedent—as were other impeachment procedures considered to have been wrongly invoked.

*Id.* at 531–32 (footnotes omitted). Thus, the English notion of an impeachment "trial," upon which American theory was ultimately modeled, allows for the use of special committees to gather evidence and hear witnesses in advance of final deliberations before the full body designated to decide the question.

### b. American Practice

During the first 199 years of American constitutional history, there is no documented record of any use by the Senate of an evidentiary committee in an impeachment proceeding. But the uniformity of hearings before the full Senate, at a time when impeachments were rare and the Senate was smaller, does not necessarily mean that the framers intended that committees could never be used as a tool in impeachment trials. There is simply no basis in the historical record to believe that the Senate's failure to employ a committee during its early impeachment trials reflected any considered judgment that such an alternative was beyond its constitutional authority. Rather, all we know is that, for many years, the Senate apparently found it unnecessary even to consider using evidentiary committees in impeachment proceedings, and none was used; but when circumstances were perceived to be different in 1935, the Senate adopted Rule XI allowing for the use of such committees. *See* Williams, *supra,* at 540.[18]

Gerhardt, *supra* note 6, at 10 (footnotes omitted).

---

at 22 (same). At bottom, however, there is no dispute that English practice, with certain explicit exceptions, served as the foundational model for the American constitutional provisions. As one commentator recently summarized:

> The impeachment procedure set forth in the United States Constitution has its origin in the states' experiences with impeachment prior to the Constitutional Convention. These state procedures were in turn influenced by the English experience with impeachment from the thirteenth through the eighteenth centuries.

**18.** In the years since the Constitution's ratification, the Senate has grown from 26 to 100 members and the federal judiciary has grown more than forty-fold. The pace of impeachments also appears to have increased. From the nation's founding until 1985, there were 11 impeachment trials in the Senate, roughly one every generation, *see* Feerick, *Impeaching Federal Judges: A Study of the Constitutional Provisions,* 39 FORDHAM L. REV. 1, 25 (1970); Williams, *supra,* at 540; since 1985, there have been three.

The origin of Rule XI confirms that its adoption was motivated by evolving circumstances in which full evidentiary hearings on the Senate floor were becoming increasingly unwieldy and, in all probability, prejudicial to the interests of the accused. The idea of establishing evidentiary committees in connection with impeachment trials was first proposed in 1904, when "Senators, aware of the growth in the Senate's size and of the accelerating development of its legislative function, beg[a]n to voice concern about the onerousness of their impeachment duties." *Id.* That early proposal languished in the Senate Rules Committee but was revived 30 years later after poor attendance by senators at subsequent impeachment trials proved an institutional embarrassment. *See id.* at 541–42.

At the 1913 trial of Circuit Judge Robert Archbald, for example, at a time when the Senate was composed of 94 members,

> Judge Archbald's counsel, Alexander Simpson, was distressed to find that the trial proceedings rarely attracted the attention of more than 20 Senators and that even the composition of the group attending was constantly changing: following their normal routines, the Senators, far from behaving like judges and jurors during a trial, wandered in and out of the Senate chamber at will, often gathering only in response to a quorum call.

*Id.* at 541 (footnote omitted). Attendance was even smaller at the 1933 trial of District Judge Harold Louderback. Representative Hatton Sumners, one of the House impeachment managers, complained to *Time* magazine that "[a]t one time only three senators were present and for ten days we presented evidence to what was practically an empty chamber." *Id.* at 542 n. 160 (quoting TIME, Mar. 13, 1936, at 18). Concerns over the Senate's handling of these trials led directly to the adoption of Rule XI.

Given the foregoing history, I do not view the Senate's earlier experience in conducting full evidentiary proceedings on the Senate floor as revelatory of any constitutional commandment. Moreover, there is at least one express acknowledgment in early American writings that the Senate might employ evidentiary committees in trying impeachments. While he was serving as vice president of the United States and president of the Senate, Thomas Jefferson drafted what is still regarded as the most authoritative manual on the rules of the Senate. In it, he noted that the Senate's rules are in part derived from English parliamentary practice and that English practice permitted the use of evidentiary committees in conducting impeachment trials. In the House of Lords, Jefferson observed with apparent approval,

> [t]he practice is to swear the witnesses in open House, and then examine them there; *or a committee may be named, who shall examine them in committee,* either on interrogatories agreed on in the House, or such as the committee in their discretion shall demand.

T. JEFFERSON, JEFFERSON'S MANUAL OF PARLIAMENTARY PRACTICE, *reprinted in* H.DOC. No. 277, 98th Cong., 2d Sess. 109, 296 (1985) (emphasis added). This suggests that, at least in Jefferson's view, no constitutional impediment existed to the Senate's use of committees in trying impeachments. As one scholar has noted, although Jefferson was not himself a member of the Constitutional Convention, "[s]ince the *Manual*'s publication followed close on the heels of the Constitution's ratification, we may assume that its conclusions are not at odds with the intentions of the framers." Williams, *supra*, at 539. In any event, while Jefferson's views are not dispositive, they do give further evidence of the relevance of the English tradition.

I recognize that the occasional English use of committees in trying impeachments is not a conclusive answer to the question regarding the intentions of the Constitution's framers. There were, after all, elements of English impeachment practice— such as the imposition of criminal and even capital punishment upon conviction and the allowance for conviction by vote of a simple majority—that the framers affirmatively sought to disavow or recast in the American system. *See* P. HOFFER & N. HULL, *supra* note 14, at 97; Gerhardt, *supra* note

6, at 16–17, 23 & n. 116. Building upon a base of English precedent, the framers undeniably effected an "Americanization of impeachment—fitting it to American needs, making it republican, defining its limits, [and] experimenting with constitutional formulations." P. HOFFER & N. HULL, *supra* note 14, at xiii. Yet, the existence of this precedent, and the absence of any affirmative rejection of it by the American framers, effectively refutes the suggestion that the use of committees in impeachment trials would have been alien or repulsive to those who designed the Constitution. As Professor Williams has concluded:

> At the very least, the lack of recorded controversy over impeachment procedures—in contrast to the belabored debates over the substantive law of impeachment and its place in the American constitutional scheme—suggests that the framers did not feel any need to depart sharply from English procedural practice, even though they deviated from the English impeachment model in other respects.

Williams, *supra,* at 520 (footnote omitted); *see also id.* at 537–38, 543–44.

I conclude that the practice of using special impeachment committees to collect evidence in advance of final consideration by the full Senate can be accommodated within the parameters of the Constitution's text and the other historical indicia of the framers' intent. It cannot be said, given the history of English impeachment practice and the framers' own statements, that the framers intended to *require* that the receipt of evidence and the examination of witnesses in impeachment trials always take place in their entirety before the full Senate. Consequently, I would find that the Senate's limited use of an evidentiary committee in connection with Nixon's case did not deprive him of the sort of "trial" to which he was constitutionally entitled.

Nixon objects that the deliberations by the full Senate in his case, based as they were on final arguments by the parties and the committee's report on the evidence, cannot be considered a "trial" in the sense that Americans have always understood that word.[19] This is all the more true, Nixon contends, because credibility determinations were crucial to the ultimate assessment of his guilt or innocence and yet 88 of 100 senators did not see the witnesses testify in person and thus had no opportunity to draw their own inferences about the witnesses' veracity.

If Nixon's were an ordinary criminal trial, I would readily agree. But, as already noted, history makes clear that the framers never intended impeachment trials to mirror criminal trials; nor was it ever supposed that the Senate would be transformed into an Article III court when it took up the task of trying an impeachment. By the framers' design, "impeachment hearings were not trials in which the senators were jurors, despite the fact that they sat upon oath or affirmation, so much as deliberative sessions, when they decided whether an official had betrayed his public trust." P. HOFFER & N. HULL, *supra* note 14, at 106; *accord* Williams, *supra,* at 576–77. Thus, what the Constitution requires of the Senate in conducting impeachment trials is not rigid adherence to criminal procedure but a solemn attention to fair-

---

**19.** Nixon also argues that the Senate's use of a 12–member evidentiary committee effectively defeats one of the framers' reasons for choosing the Senate over the Supreme Court as the most appropriate forum for impeachment trials. Nixon points out that the framers preferred the Senate as a court of impeachment over the Supreme Court in part because the Senate, then comprised of 26 members, was larger. *See* THE FEDERALIST NO. 65, *supra,* at 441–42. The framers believed that placing the power to remove high federal officials in the more "numerous" Senate would help to ensure the independence and integrity of the decisionmaking. *See id.;* Notes of James Madison (Sept. 8, 1787) ("Mr Govr

Morris thought no other tribunal than the Senate could be trusted [with the task of trying impeachments]. The Supreme Court were too few in number and might be warped or corrupted."), *reprinted in* II M. FARRAND, *supra* note 14, at 551. Yet, it is far from clear what this should suggest about the constitutionality of the Senate's use of an evidentiary committee in Nixon's case. Whatever the committee's role in *gathering evidence,* the final deliberations and decisionmaking concerning Nixon's guilt *were* conducted by the full Senate, fulfilling the framers' intention that conviction or acquittal be decided by a more "numerous" body.

ness guided by whatever procedures the Senate reasonably finds fitted to that end. Simply put, the fact that the framers "designed a deliberately cumbersome removal mechanism," *see* Edwards, *supra* note 14, at 767, does not mean that the Constitution must be interpreted to command the *most cumbersome* procedures imaginable.

The notion that senators might make credibility determinations without having scrutinized the witnesses in person is not, contrary to Nixon's assertions, alien to accepted standards of procedural fairness in this country. Administrative tribunals, for instance, are thought fit to make decisions, including judgments on credibility, based on a record compiled elsewhere by a hearing examiner and that these judgments may be upheld even though contrary to those reached by the examiner who actually heard the witnesses testify. *See, e.g., Universal Camera Corp. v. NLRB,* 340 U.S. 474, 494–96, 71 S.Ct. 456, 467–69, 95 L.Ed. 456 (1951) (examiner's factual findings, particularly as to witness credibility, are probative and entitled to weight, but Board may reach contrary conclusions). *See generally* Williams, *supra,* at 590–606. I do not mean, of course, to equate the Senate's role in trying an impeachment with an agency's in conducting an adjudication; the Senate's responsibility is often far more grave and the implications of its decision far more significant in the life of the nation. At the same time, the experience of these tribunals establishes that, while Nixon's notion of a "trial" is one that is recognized as the appropriate model for an Article III court, it is not the exclusive notion of a fair trial. Given that the Senate is not an Article III court, and is not expected to become one for purposes of trying impeachments, there is no reason to bind it to every procedure thought apt in a traditional judicial forum. *See* Gerhardt, *supra* note 6, at 94 (examining the Senate's use of evidentiary committees in the Nixon and Hastings impeachment trials and concluding that "[t]here is little doubt such a

procedure is constitutional"); Williams, *supra,* at 619–20.

This conclusion seems especially clear in light of the concession by Nixon's counsel at oral argument that the Constitution does not require the attendance of all senators, or even most senators, at an impeachment "trial." The Senate could constitutionally "try" Nixon even with fewer than 12 senators present, Nixon's counsel argued, so long as it was done on the Senate floor.[20] But the constitutional significance of the difference between that scenario and the sort of evidentiary proceeding provided Nixon eludes me. To the contrary, I believe that the procedure employed by the Senate in this case—a prolonged evidentiary hearing before a special committee followed by review, argument and deliberation by the full Senate—is far better calculated to achieve the ends intended by the framers, *i.e.,* that the ultimate decision be grounded in evidence rather than partisan passion, that it be arrived at by a "numerous" body and that the fact-finding upon which it is based be conducted with a solemn attention to fairness such as would command the respect and adherence of a potentially divided nation.

Consequently, I would find that the Senate acted within the bounds of its constitutional authority when it convicted Nixon based partly on evidence gathered by a special impeachment trial committee.

### III. Conclusion

For the foregoing reasons, I would find that Nixon has presented a justiciable controversy. On the merits, however, I would find that the Senate did in fact "try" Nixon within the meaning of the Constitution and that Nixon was therefore constitutionally deprived of his office. I would affirm the judgment of the District Court on these grounds.

---

**20.** As I have already suggested, history has shown that this hypothetical is not entirely out-landish.